No. 6132.

D. P. CUDD v. THE STATE.

HORSE THEFT—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for horse theft.

APPEAL from the District Court of McCulloch. Tried below before the Hon. J. C. Randolph.

The conviction in this case was for the theft of a horse, the property of Ab. Turner, in McCulloch county, Texas, on the fifteenth day of July, 1884. A term of ten years in the penitentiary was the penalty assessed by the verdict.

Ab. Turner was the first witness for the State. He testified that he lived above Camp San Saba, McCulloch county, Texas, in 1884. At that time he owned the horse mentioned in the indictment. That animal was bay in color, was then about three years old, and was branded AF (connected) on the hip. He ran on the witness's range, near Camp San Saba, until about February 12, 1884, when he disappeared. Witness searched for but failed to find the said animal, and did not see it again until May 14, 1888, when he found it in the possession of one J. Keidel. The AF (connected) brand was still on the horse, but he was also branded CJK, the J and K being connected. Witness knew the horse also by his flesh marks, one of his feet being white. Witness knew nothing about the taking of the horse more than that he was taken, without witness's knowledge or consent, from the range in McCulloch county.

Marion Miller testified, for the State, that he saw the defendant in the town of Brady, McCulloch county, Texas, in the winter of 1884—in January, 1884—but he did not think that defendant then had his domicile in that county. He saw him again at the house of his sister, Miss Johnnie Cudd, in McCulloch County, in February or March, 1884. He never saw defendant doing anything or following any business.

M. T. Lavelle, the next witness for the State, testified that, in February, 1884, he lived on the Mason road, about four miles from Brady City, in McCulloch county, Texas. Witness last saw the defendant early in 1884 at the head of Rumsey creek, which was

" over the divide," about eight miles south from Brady. He and two other white men and a negro were then camped in a brush dug out. The other white men were Bill Walton and Bud Moore. Witness did not know the present whereabouts of Walton and Moore, and did not think he would be able to identify the negro if he was to see him. Witness afterwards saw the defendant in Brady with a bunch of horses, of which he appeared to have the care. Among those horses was one branded EE, which witness afterwards saw in the possession of J. Keidel. The said EE horse once belonged to J. D. Worrell.

J. Keidel testified, for the State, that in January and February, 1884, he lived in Lavaca county, Texas, three hundred miles from Brady. On the twenty-sixth day of February, 1884, the witness bought from defendant the horse described in the indictment. The horse was in the AF (connected) brand, and no other. He executed to the witness a bill of sale conveying that and four or five other horses, one of which was a bald faced sorrel branded EE on the left shoulder. Witness moved to Runnels county about April 1, 1884, taking those horses with him. Witness put his brand—CJK—on the AF horse, and worked him from Runnels county to Brady, where Turner saw and claimed him. Several persons were present when witness bought the horses from defendant in Lavaca county, and defendant knew at that time that witness was going to Runnels county, and that he would take the stock with him, and witness asked defendant at the time of the purchase where the horses would go to if they got away from him. Defendant replied that he bought the horses in a western county, the name of which witness could not recall, and that, if they got away from witness they would likely go back to that county. Defendant had a bill of sale to the horses, and copied the brands from that bill of sale into the one he executed to witness. A man named Dunn claimed the horse at Ballinger for Turner. Witness had ridden that horse cow hunting in McCulloch county before Dunn claimed him. Witness sold the EE horse to a man named Parrimore.

H. C. Dunn testified, for the State, that he knew Turner's horse before it disappeared. He last saw that horse on the range late in 1883. He next saw him in Ballinger in the possession of J. Keidel. He claimed the horse for Turner, but Keidel claimed to have bought him, and would not give him up. Witness then went before the grand jury, and saw Keidel in the grand jury room.

Statement of the case.

J. D. Worrell testified, for the State, that in 1884 he lived near Camp San Saba, in McCulloch county, and knew the Ab. Turner horse mentioned in the indictment. In January or February, 1884, the witness lost a horse branded EE. He afterwards went to Runnels county to look for that horse, and found him in the possession of Mr. Parrimore. On that same trip he saw the Turner horse in the possession of J. Keidel.

Charles Cass testified, for the State, that he lost two horses from the Rumsey creek range in 1884, and afterwards went to the house of J. Keidel, in Runnels county, to look for them. He did not find his horses, but saw Turner's horse in the possession of said Keidel.

Gus Dubose was the first witness for the defense. He testified that, in November, 1883, the defendant employed him to help drive a bunch of sixty-one head of horses from DeWitt county to a market. They drove the horses from DeWitt to McCulloch county. They lost several head of horses near Lockhart, in Caldwell county, Texas, and two mares and a colt on the Llano river, below the town of Brady, in McCulloch county. They spent two or three weeks on the road between DeWitt county and McCulloch county. When they reached McCulloch county they drove the horses to the ranch of Mr. Dave Cudd, the defendant's uncle, a few miles south of Brady. After a time the horses began to drift west. Witness and defendant followed and rounded them up near the head of a creek, where they held them for three weeks or a month longer. While camping at the head of that creek they were joined by two men who called themselves Bill Walton and Bud Moore. Walton and Moore had a camp about fifty yards distant from defendant's camp, and were holding a bunch of horses on the range. Witness, defendant, Walton and Moore were frequently together. On or about February 3 witness and defendant drove the defendant's horses to the pasture of a Mr. Dodge, or Dodd (witness thought the name was Dodge), and put them in the pasture, for Mr. Dodge to sell for defendant. Witness and defendant then started back to DeWitt county, taking with them only the saddle horses they were riding. While nooning on the second day, a very short distance from the town of Llano, they were joined by a white man and a Mexican, neither of whom the witness had ever seen before. They had some horses with them, and the white man had a piece of wagon sheet, a frying pan and a coffee pot tied on behind his saddle. The white man said

that he had been working stock out west.  Defendant then spoke of the mares and colt he had lost, and before he got through describing them the white man finished the description, and said that he had seen them at some point he mentioned.  Defendant then proposed to sell the mares and colt to the man.  He said that he did not want to buy, but would sell the horses he had.  Defendant replied that he did not want to buy horses, but if the man, who gave his name as Cooper, could make a good bill of sale to his stock, he, defendant, would buy, trading his said mares and colt in part payment.  After some talk the trade was struck, and defendant, in witness's presence, paid Cooper one hundred and seventy-five or two hundred dollars in money and the mares and colt for the horses.  Defendant and Cooper then went to Llano together, for Cooper to execute a bill of sale.  Witness remained in camp with the horses until defendant returned with a bill of sale.  Witness remembered that one of the horses bought by defendant was branded AF connected, and another was in the brand claimed by Mr. Carr.  Witness did not remember the exact number of horses bought by defendant from Cooper, but knew that they numbered as many as six.  Cooper was a man about twenty-two years old, and had a dark complexion, hair and eyes, and was slender of build.  Witness did not, as agent for defendant, sell any horses in McCulloch county, and if defendant sold any he did not know it.

Addison Kilgore, sheriff of DeWitt county, testified, for the defense, that he had known the defendant from his youth.  He knew as a fact that from his youth until his arrest the defendant had borne the highest reputation for honesty and integrity.  He was universally esteemed as a "hard working, strictly honest, debt paying and law abiding citizen."

James Valentine, of Lavaca county, testified substantially as did the witness Kilgore.

The defense next introduced in evidence the bill of sale, with its indorsement of record and authentication, executed on February 4, 1884, in Llano county, Texas, by J. J. Cooper, conveying to D. P. Cudd certain horses, among them a bay horse with white foot, branded AF connected on left thigh.

*W. J. Baker* and *Fly & Davidson,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WILLSON, JUDGE.   We can not reconcile it to our sense of right and to our view of the law to permit this conviction to stand.   We do not think that the evidence, as it is presented to us, supports the conviction.   Defendant proved that he pur-chased the horse from one Cooper, and produced on the trial a duly authenticated bill of sale from said Cooper.   While there are some circumstances in proof which throw some suspicion upon the bona fides of said purchase, they are of slight weight, and do not, we think, disprove the purchase, or the good faith of the defendant in the transaction.   These suspicious circum-stances are all consistent with the defendant's innocence.

In addition to proving that he purchased the horse, he estab-lished a good character for honesty in the community in which he lived for a number of years.   It does not appear that the facts of the case were as fully and clearly developed upon the trial as they might have been, and can yet be, both on the part of the State and of the defendant.   We think the ends of jus-tice may be subserved by remanding the cause for a new trial. We deem it unnecessary to notice other questions raised in the record, as they are of character which may not arise on another trial.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*